**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

OMAR SHAHEER THOMAS,

                     Petitioner,

          v.

STEPHEN JOHNSON &
THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY,

                     Respondents.

Civil Action No.: 18-0710 (ES)

OPINION

SALAS, DISTRICT JUDGE

Petitioner Omar Shaheer Thomas ("Petitioner"), an individual currently confined at New Jersey State Prison in Trenton, New Jersey, filed the instant petition for a writ of habeas corpus *pro se* pursuant to 28 U.S.C. § 2254. (D.E. No. 1 ("Petition")). Following an order to answer, respondents Stephen Johnson and the Attorney General for the State of New Jersey (together, "Respondents") opposed the Petition. (D.E. Nos. 3 & 5). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons expressed below, the Court DENIES the Petition and DENIES a certificate of appealability.

## I.    BACKGROUND

The New Jersey Superior Court, Appellate Division provided the following factual summary on direct appeal:[1]

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

On Sunday, December 1, 2002, at approximately 11:36 a.m., the bodies of Erik Rewoldt and Jeffrey Eresman were discovered inside a computer-game retail store doing business as FuncoLand, located at 275 Route 10 (known as the Roxbury Mall), in Roxbury Township.  Rewoldt died from a single gunshot wound to the head, while Eresman suffered two gunshot wounds to the head.  All three bullets were .38–caliber ammunition and were fired from the same weapon.

Detectives determined that Eresman was to open FuncoLand at 10:30 a.m., and Rewoldt was to report to work at 11:00 a.m. Receipts indicated that three purchases were made after the store was opened by Eresman.  A purchase occurred at 11:09 a.m. and a second purchase was made at 11:11 a.m.  The final transaction receipt showed a Tekken II advance videotape game was sold at 11:12 a.m.  A physical inventory of the store was undertaken on December 1, 2002.  The inventory indicated that seventeen game systems were missing, with a total retail value of $1984.83 [sic]. There were also 183 games missing, with a retail value of $10,032.94.

Videotape evidence showed [Petitioner] in the area of FuncoLand prior to the incident.  Flyers were made from the image depicted on one of the videotapes, some of which were placed in newspapers. An individual called the Roxbury Township police department and identified the person in the flyer as [Petitioner].  Additionally, a confidential source provided information to the Newark Police Department that the flyer depicted [Petitioner].  This information was not provided to the jury.

Eyewitnesses also testified that they observed a blue car with a black door on the driver's side at the scene on December 1, 2002. Witnesses saw African-American males in the car.  It was later determined that this car belonged to [Petitioner]'s wife.  A witness in the area at the time of the incident identified [Petitioner] as the person she saw in front of a neighboring store on December 1, 2002, at approximately 11:15 a.m.  One of the customers in the store just prior to the killings identified [Petitioner] as the man she saw in FuncoLand on December 1, 2002, "with 90% certainty."  A second customer, after being shown a photo array, stated, "this looks very close to the man I saw in the store."  It was [Petitioner]'s photograph.

Deputy Chief James Gannon of the Morris County Prosecutor's Office (MCPO) instructed police to stop, but not arrest, [Petitioner] on Monday, November 17, 2003, to obtain [Petitioner]'s consent to

voluntarily answer their questions. On November 17, officers located the [Petitioner] on the street near his home and asked him if he would answer some police questions, which he said he would. [Petitioner] was taken to the Irvington Initiative at the State Police facility in Irvington. Lt. James Simonetti of the Roxbury Township Police Department and Mark Smith of the MCPO interviewed [Petitioner] at about 9:40 a.m. They advised him of his *Miranda*[] rights, and he waived them.

Initially, [Petitioner] said he was in his car at the Roxbury Mall with "Rock," (Rahman Vaughn), and [Petitioner]'s cousin, "Joey," (Craig Thomas, Jr.), when Rock and Joey robbed FuncoLand. [Petitioner] said he drove them to the mall in a blue Ford Escort with a black door. After the robbery, Joey told him that Rock had shot the two guys inside the store. Police asked [Petitioner] to help them locate Rock and Joey and he agreed to do so. After the initial interview, [Petitioner] ate lunch and Simonetti informed him that he was no longer free to leave because he had admitted to participating in the robbery and homicide.

At 1:33 p.m., Simonetti and Smith conducted another interview of [Petitioner]. This interview was tape recorded. They again advised [Petitioner] of his *Miranda* rights and he waived them. [Petitioner] described picking up Joey and Rock and driving to the Roxbury Mall. He stated they arrived at 8:00 a.m., expecting the stores to be open, but they were not. They then drove to McDonald's, ate breakfast, and he closed his eyes for a while. [Petitioner] then described how they approached the stores. He and Joey went inside FuncoLand where he found three women inside the store. He stated he bought a game and then went to Marty's Shoe store. He said that Joey stayed at FuncoLand and, shortly thereafter, Rock joined Joey there. [Petitioner] stated that he purchased shoes at Marty's and then went to his car. As he approached, Joey was standing by the car and told [Petitioner] that Rock had shot two guys in the store. Rock then approached the car carrying games. [Petitioner] asserted that Rock told him that he did what he had to do. After that, [Petitioner] said he dropped Rock off in Newark and went to church with his wife.

Police showed [Petitioner] the flyer from the McDonald's surveillance camera and the sketch that a witness had helped police compile. He confirmed that the flyer was a picture of himself, but that the sketch did not depict him. [Petitioner] also identified pictures of the victims, Eresman and Rewoldt.

3

Simonetti asked [Petitioner] if he had any problems while he had been in police custody.  [Petitioner] answered that he had no problem and that he had been treated fairly by the police.

[Petitioner] prepared a statement, which he concluded reading at 2:33 p.m.  He told police that he did not own a gun or use a gun.  He also stated that he did not kill Eresman or Rewoldt and had no prior knowledge of what was going to transpire on December 1, 2002.  After giving his statement, [Petitioner] cooperated with the police by accompanying them as they drove around attempting to locate Rock and Joey.  During the trip, [Petitioner] suffered an asthmatic attack.  Police gave him a bag to breathe into and, according to Simonetti, [Petitioner] said he was fine.

[Petitioner] was returned to an interview room around 6:00 p.m. at which time he was given food and time to rest.  At approximately 9:00 p.m. on November 17, 2003, [Petitioner] agreed to drive with the police and show them the route he had traveled on the morning of December 1, and what he had done at the Roxbury Mall.  During this drive, the police video recorded [Petitioner].  The video recording began at 11:13 p.m.  At 11:19 p.m., police stopped recording and drove to the Roxbury Mall.  The tape resumed at 11:27 p.m. [Petitioner] walked the police through what he maintained he had done on December 1, which was essentially the same story he had told police earlier in the day.  He added that he went inside FuncoLand before the robbery and saw Rewoldt.  Additionally, [Petitioner] said the gun that Rock had was "nickel plated, light 4–4."

At the end of the video, [Petitioner] again said that he had been treated fairly.  At 11:56 p.m., the questioning concluded.  [Petitioner] was taken to the Roxbury police department and placed in a holding cell for the night.  At that time, the police executed a search warrant on [Petitioner]'s person and took all of his clothing, except his underwear.  At approximately 2:00 a.m. on November 18, 2003, the police arrested Joey.  Joey admitted that he was involved in the FuncoLand robbery with [Petitioner] and Rock, and stated that [Petitioner] shot Eresman and Rewoldt.

Early in the morning of November 18, police executed a search warrant at University Place, Irvington, where [Petitioner] had been staying, and Dewey Street, Newark, [Petitioner]'s mother's address.  At Dewey Street, police found a Play Station game system.  At University Place, police found fifty-eight video games.  At about 7:30 a.m. on November 18, Simonetti brought [Petitioner] some

food and clothes to wear.  Simonetti believed [Petitioner] had slept that night.

At 11:19 a.m. on November 18, after waiving his *Miranda* rights, [Petitioner] gave another statement to Simonetti and Smith.  Police secretly video recorded this statement.  Smith told [Petitioner] that the police had spoken to Joey and that Joey said [Petitioner] had "shot the guy in the back . . . then everybody went into a panic and all hell broke loose."  [Petitioner] denied that he shot anyone.  Smith told [Petitioner] that if the gun went off accidentally that he should be honest about it and the police would "work with him."  Smith also said "we know you shot the first shot in the back room."  [Petitioner] continued denying he had a gun.  Simonetti said, "but you accidentally shot the guy the first time," and for the first time [Petitioner] answered, "yes."

[Petitioner]'s story then changed and he related that Joey fired the first shot at Eresman and then [Petitioner] accidentally fired the second shot at him.  After those shots were fired, [Petitioner] said a couple came to the door and Rock told them that the store was closed.  When Rewoldt arrived, Rock took the gun from [Petitioner] and shot Rewoldt.  Simonetti and Smith continued to question [Petitioner] but his story stayed essentially the same.

The few times they discussed sentencing and the possibility of a plea bargain, [Petitioner] responded that, "I'm willing to take the best plea bargain ever with the prosecutor but I'm not going to be accountable for two things that I didn't do."  Smith told [Petitioner]:

> [w]ell, your Public Defender is going to—when you get to County and they're going to get you a Public Defender.  I guess that happens like within a day or two or whatever.  And then that Public Defender will get in touch with the Prosecutor.  His Defender will get in touch with the Prosecutor.  His name's McNamara.  And you know, they'll work it out.

On the afternoon of November 18, 2003, police apprehended Rock, who stated that [Petitioner] shot Eresman and Rewoldt.  At 4:59 p.m., the judge issued arrest warrants for [Petitioner], Rock and Joey.  The police officers did not immediately execute the arrest warrant for [Petitioner] nor did they notify him of its issuance.  Police transported [Petitioner] to the MCPO.

At approximately 8:00 p.m., [Petitioner] again waived his *Miranda* rights and agreed to speak with Simonetti and Gannon.  The

statement was not recorded.  Gannon told [Petitioner] that Rock said that [Petitioner] had shot both victims.  [Petitioner] reiterated that Joey initially had the gun and shot Eresman.  However, for the first time, [Petitioner] admitted that he had shot Rewoldt.

At 9:31 p.m., Simonetti and Gannon conducted a video recorded interview with [Petitioner].  Simonetti advised [Petitioner] of his *Miranda* rights and [Petitioner] waived them.  [Petitioner] was advised that he had been charged with felony murder, first-degree robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon.  [Petitioner] responded that he understood the charges, but then asked the difference between felony murder and murder.  Gannon told him that felony murder was a murder during a felony, in this case robbery.

At 9:34 p.m., Simonetti again advised [Petitioner] of his *Miranda* rights and [Petitioner] once again waived them.  After eliciting that [Petitioner] was capable of reading, writing, and understanding English, he was asked if he was under the care of a doctor. [Petitioner] responded that he did receive care for asthma and that he had an asthma attack the previous evening when he was in the police car.  He further stated he felt comfortable and was not under the influence of any drugs or alcohol.

[Petitioner] then discussed the planning of the FuncoLand robbery with Rock and Joey.  [Petitioner] explained how they got a nickel-plated revolver.  He described how they planned the robbery, agreeing that Joey should go inside FuncoLand first and let Rock know if anyone was in there.  Subsequently Rock would go inside, then Rock and Joey would rob the place and get away.  They agreed to meet on December 1 around 7:00 a.m.  The plan was for Rock and Joey to undertake the robbery of FuncoLand while [Petitioner] drove the car.  Then, in exchange, Rock and Joey would help [Petitioner] rob Best Buy and [Petitioner] would pay them each $750 and a television.

[Petitioner] related how on December 1, 2002, he picked up Rock and Joey and all three drove to the Roxbury Mall area, stopping first at McDonald's.  [Petitioner] described the clothes he was wearing and the robbery, but asserted that Joey shot Eresman.  [Petitioner], however, admitted that when he saw that Eresman was still moving, he took the gun and shot him one more time.  [Petitioner] was concerned that Eresman would be able to identify him if Eresman survived.  They then proceeded to put the game systems and games

6

into garbage bags.  A Caucasian man approached the front door, but Rock told him the store was closed and locked the door.

Then Rewoldt approached the store and unlocked the door with his keys.  [Petitioner] shot Rewoldt and immediately ran out the door.  [Petitioner] went to his car, made a U-turn, pulled up to the front door of FuncoLand, and Rock came out of the store with the robbery proceeds.  [Petitioner] stated that in total they stole about nine game systems and fifty to eighty games.  [Petitioner] said his statement was truthful and he was sorry for what happened.

*State v. Thomas*, No. A-3347-08T4, 2013 WL 1688374, at *1–5 (N.J. Super. Ct. App. Div. Apr. 19, 2013).

A grand jury returned an indictment charging Petitioner with two counts of first-degree murder in violation of New Jersey Statute Annotated ("N.J.S.A.") § 2C:11-3a(1) & a(2); two counts of felony murder in violation of N.J.S.A. § 2C:11-3a(3); one count of first-degree robbery in violation of N.J.S.A. § 2C:15-1a(1); one count of second-degree possession of a weapon for an unlawful purpose in violation of N.J.S.A. § 2C:39-4a; one count of third-degree unlawful possession of a weapon in violation of N.J.S.A. § 2C:39-5; one count of the first-degree use of a person 17-years of age or younger to commit a crime in violation of N.J.S.A § 2C:24-9a; and one count of fourth degree possession of prohibited ammunition in violation of N.J.S.A. § 2C:39-3f. (D.E. No. 7-1 at 1–3, First Indictment).[2]  The grand jury also returned a second indictment charging Petitioner with one count of second-degree possession of a weapon for an unlawful purpose in violation of N.J.S.A § 2C:39-4a, and one count of violating the regulatory provisions regarding the purchase of firearms, a crime of the fourth degree, in violation of N.J.S.A. §§ 2C:39-10 & 2C: 58-3.  (D.E. No. 7-1 at 7–8, Second Indictment).  The grand jury also charged Petitioner with two counts of certain persons not to possess a firearm in violation of N.J.S.A. § 2C:39-7b.  (*Id.* at 9–

---

[2]        For pin cites to Docket Entry Numbers 5-1, 6-7, and 7-1, the Court relies on the pagination automatically generated by the CM/ECF.

10).

The State also alleged certain aggravating factors to each charge of first-degree murder making Petitioner eligible for capital punishment.  (*See* D.E. No. 7-1 at 4–5, First Indictment); *see also Thomas*, 2013 WL 1688374, at *5.  On December 17, 2007, however, the New Jersey Legislature enacted a new homicide statute that eliminated the death penalty.  *See Thomas*, 2013 WL 1688374, at *5 (citing N.J.S.A. § 2C:11-3 (2007)).  Although the parties stipulated that the new statute did not apply to Petitioner, the prosecutor did not seek the death penalty as a matter of fundamental fairness.  (*See* D.E. No. 6-51, June 16, 2008 Mots. Tr., at 64:8–13 & 80:17–23).

On December 14, 2004, Petitioner filed a notice of motion to suppress his statements to the police.  (D.E. No. 7-1 at 11–12, Notice of Mot. to Suppress Statements).  On March 28, 2005, Petitioner filed an additional motion for an order suppressing the statements on the grounds that Petitioner was the subject of an illegal and warrantless search and seizure.  (D.E. No. 7-1 at 13, Notice of Mot. for Suppression of Evid.).  The Honorable Judge Salem Vincent Ahto, P.J.S.C., conducted an evidentiary hearing pursuant to N.J.R.E. 104(c).  (D.E. Nos. 6-14 to 6-30).  Judge Ahto denied Petitioner's motion to suppress his statements to police based on illegal seizure and ruled that the State met its burden to demonstrate that Petitioner's statements were voluntary.  (D.E. No. 5-1 at 62–64, Order Den. Mot. for Suppression of Evid.; D.E. No. 6-31, Mar. 15, 2007 Tr.).

The Appellate Division denied Petitioner leave to file an interlocutory appeal on May 9, 2007.  (D.E. No. 6-9, May 9, 2007 Order Den. Mot. for Leave to Appeal).  On July 3, 2007, the New Jersey Supreme Court denied Petitioner leave to appeal.  (D.E. No. 6-10, July 3, 2007 Order Den. Mot. for Leave to Appeal).  Petitioner filed a motion for reconsideration of Judge Ahto's decision, which His Honor denied on May 5, 2008.  (D.E. No. 6-35, Apr. 30, 2008 Pretrial Tr., at 30:14–15; D.E. No. 7-1 at 15–17, Order Den. Mot. for Recons.).

Petitioner's trial spanned twenty-eight days between May, June, and July 2008.  (D.E. Nos. 6-36 to 6-65).  On July 24, 2008, Petitioner was convicted of counts one and three for first-degree murder, counts two and four for felony murder, count five for first-degree robbery, count six for second-degree possession of a weapon for an unlawful purpose, count seven for third-degree unlawful possession of a weapon, and count eight for employing a juvenile to commit a crime. (*See* D.E. No. 5-1 at 69–70, Verdict Sheet).

Petitioner received a sentence of:

> two consecutive terms of life imprisonment without parole on counts one and three and merged counts two and four into counts one and three, respectively.  On count five, the court imposed an eighteen-year term of imprisonment, subject to eighty-five percent parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. [§] 2C:43–7.2, and subject to five years of parole supervision, to run consecutive to the sentences on counts one and three.  On count six, defendant received a six-year term of imprisonment with three years parole ineligibility, to run concurrent with the sentence on count one.  On count seven, the court sentenced defendant to four-years imprisonment, with three years parole ineligibility, to run concurrent with the sentences on counts one and six.  On count eight, defendant received a term of fifteen-years imprisonment, to run concurrent with the sentence on count one.

*Thomas*, 2013 WL 1688374, at *11.

On March 30, 2010, Petitioner filed a notice of appeal.  (*See* D.E. No. 6-7 ("Direct Appeal Br.")).  On April 19, 2013, the Appellate Division affirmed Petitioner's convictions, except it remanded for the merger of counts five and six.  (D.E. No. 6-2, Order Remanding for Merger of Count Six with Count Five); *Thomas*, 2013 WL 1688374, at *36.  The New Jersey Supreme Court subsequently denied Petitioner's petition for certification on his convictions.  (D.E. No. 6-6, Order Den. Pet. for Certification).

Thereafter, the New Jersey Superior Court dismissed Petitioner's initial *pro se* post-

conviction relief ("PCR") petition as deficient.  (D.E. Nos. 5-8 to 5-9).  On May 19, 2014, through counsel, Petitioner filed an amended PCR petition.  (D.E. No. 5-11, Am. Pet. for Post-Conviction Relief).  On April 29, 2015, the Superior Court denied the amended PCR petition.  (D.E. No. 6-67, PCR Hearing Tr., at 6:20–32:15).  The Appellate Division affirmed the denial of the amended PCR petition on June 29, 2017.  *State v. Thomas*, No. A-0496-15T3, 2017 WL 2978380 (N.J. Super. Ct. App. Div. June 29, 2017).  The New Jersey Supreme Court then denied Petitioner's petition for certification.  *State v. Thomas*, 177 A.3d 106 (N.J. 2017).

Petitioner filed this federal habeas petition on January 17, 2018, raising thirteen grounds for relief.  (*See* D.E. No. 1-1 ("Habeas Br.") at 1–50).  Respondents filed an answer asserting that Petitioner's claims are either procedurally defaulted, non-cognizable, or meritless.  (D.E. No. 5, Answer).  Petitioner filed a reply on September 14, 2018.  (D.E. No. 9 ("Reply")).

## II.   STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, a district court "shall entertain an application for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012).  District courts are required to give great deference to the determinations of the state trial and appellate courts.  *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).  Specifically, district courts must defer to the "last reasoned decision of the state courts on the petitioner's claims."  *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (internal quotation marks omitted).  Moreover, a federal court reviewing the state court's

adjudication under Section 2254(d)(1) must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a

factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

## III.   DISCUSSION

### A.   Ground One: Suppression of Petitioner's Statements to Police

In ground one, Petitioner alleges five separate arguments regarding why the trial court should have suppressed his statements to police. (Habeas Br. at 2–10). The Court addresses each argument below.

#### i.   Arguments One and Four: Illegal Stop and Arrest

Petitioner first argues that the trial court should have suppressed all his statements to the police because they were the fruit of an illegal stop and arrest. (Habeas Br. at 3–5 & 7–8). Specifically, Petitioner asserts that the police's scheme to surreptitiously install a GPS tracking device on his vehicle, approach him in the street, invite him to the police station for questioning, and arrest him constituted an illegal stop and arrest. (*Id.*).

Petitioner bases these arguments on the Fourth Amendment and the fruit of the poisonous tree doctrine. (*See* Reply at 14–17; Direct Appeal Br. at 47–54). The Fourth Amendment provides in relevant part: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Courts enforce this right through the exclusionary rule, which prohibits the introduction of evidence obtained in violation of the accused's Fourth Amendment rights in his or her criminal trial. *See*

*Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998).  "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, relevant here, 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'"  *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

Fourth Amendment claims, however, are not generally cognizable on *habeas* review.  *See Stone v. Powell*, 428 U.S. 465, 482 (1976).  In *Stone*, the Supreme Court held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial."  *Id.*  This bar applies whether the claim is potentially meritorious or not.  *See Deputy v. Taylor*, 19 F.3d 1485, 1491 (3d Cir. 1994).

Here, Petitioner has had a full and fair opportunity to litigate these claims.  Indeed, Petitioner's Fourth Amendment claims were the subject of an evidentiary hearing, a ruling by the hearing court denying his claim, and affirmance of that conclusion on direct appeal.  *See Thomas*, 2013 WL 1688374, at *16.  Accordingly, Petitioner is not entitled to federal habeas relief on these arguments.

### ii.     Argument Two: Voluntariness of Petitioner's Waiver of his Right to Remain Silent

Petitioner next argues that the trial court should have suppressed his statements to the police because the police failed to inform him that the court had issued warrants to search his person, automobile, home, and mother's home.  (Habeas Br. at 5–6).  Petitioner contends that the police's failure to advise him of the existence of the search warrants prior to his statements renders any waiver of his right to remain silent involuntary.  (*Id.*).

In support of this argument on direct appeal, Petitioner cited to *State v. A.G.D.*, 835 A.2d 291 (N.J. 2003).  (Direct Appeal Br. at 56–59).  In that case, the New Jersey Supreme Court held

that, under the New Jersey common law privilege against self-incrimination, a detainee's waiver of his right to remain silent is not knowing and voluntary, and, therefore, is inadmissible unless the government informs the detainee of his status as the target of an investigation, including the existence of any criminal complaint or arrest warrant against him. *A.G.D.*, 835 A.2d at 298.

The Appellate Division analyzed this argument as follows:

> [Petitioner] contends that the judge misapplied the governing principles of law under *Miranda*, as construed in [*State v. A.G.D.*, 835 A.2d 291 (N.J. 2003)], and *State v. Nyhammer*, 197 N.J. 383, *cert. denied*, ⸺ U.S. ⸺, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009). Based on these decisions, [Petitioner] argues the police were required to tell him that search warrants for his person, his automobile, his residence, and the residence of his mother were issued on November 13, 2003, and therefore he was a suspect. He argues that since he was never apprised of his status as a suspect, his statements were involuntary and should have been excluded.
>
> In *A.G.D.*, *supra*, 178 N.J. at 56, the Court considered a scenario in which the police had obtained a warrant to arrest the defendant for sexually abusing his daughter. Four days later, a detective went to the defendant's house and told him that the police wanted to discuss allegations of sexual abuse that had been asserted against him. *Id.* at 59. The detective did not tell the defendant of the existence of the arrest warrant, and he did not tell him that he was under arrest. *Ibid.* The defendant cooperated and accompanied the detective to the police station, where, after he was issued *Miranda* warnings, he gave an incriminating statement. *Ibid.*
>
> The Court held that the statements had to be suppressed because the defendant's waiver of his right to remain silent, under the circumstances, was not knowing, intelligent, and voluntary. *Id.* at 68. The police had extracted the statement "[w]ithout advising the suspect of his true status when he does not otherwise know it." *Ibid.* Thus, the State could not sustain its burden that the suspect had exercised an informed waiver of rights, regardless of other factors that might support the admission of his confession. *Ibid.* The Court made clear its holding was "not to be construed as altering existing case law in respect of the manner in which the police conduct interrogations other than imposing the basic requirement to inform an interrogatee that a criminal complaint has been filed or issued." *Id.* at 68–69.

In *Nyhammer*, *supra*, 197 N.J. at 389, the police contacted the defendant by telephone and asked him to come down to the police station to discuss allegations that his uncle had sexually abused his grandniece. The detective, however, never told the defendant that the child had made accusations of abuse not only against the uncle, but also against the defendant himself. At the time of the police's call, no arrest warrant or criminal complaint against the defendant had been issued. *Id.* at 389–90. The defendant complied and went to the police station, where he was given *Miranda* warnings and interrogated. At that point, the police told him about the accusations the child had made against him, whereupon he admitted to inappropriate contact with her. *Id.* at 391.

The Court held the defendant's custodial statement was admissible, even though the police had not told him that he was a suspect when they brought him in for questioning. *Id.* at 405. The Court recognized the subjective nature of the label "suspect," observing that "[a] suspect to one police officer may be a person of interest to another officer." *Id.* at 405. The Court also contrasted "suspect" status to "the issuance of a criminal complaint and arrest warrant by a judge," which is "an objectively verifiable and distinctive step." *Id.* at 404. "[T]he defining event triggering the need to give *Miranda* warnings is custody, not police suspicions concerning an individual's possible role in a crime." *Id.* at 406. Moreover, the Court was satisfied that the defendant had a clear understanding of his rights and that coercive tactics by the police were absent "throughout the interrogation." *Id.* at 409.

Here, [Petitioner] does not contend that an arrest warrant or criminal complaint had been issued before the police initially questioned him. After administering his *Miranda* warnings and [Petitioner] agreeing to speak to them, the police advised him that, based on their investigation, he was involved in the FuncoLand incident. The police, therefore, did not mislead [Petitioner].

The circumstances surrounding the Court's decision in *A.G.D.* are distinguishable from the circumstances here. Moreover, we find it was unnecessary for the police to have explicitly validated that [Petitioner] was a suspect. Under *Nyhammer*, the status of the interviewee as a suspect is only one of many factors to be analyzed for voluntariness, and is not a bright line for exclusion of custodial statements. As the Supreme Court stated, "[s]ignificantly, we are not aware of any case in any jurisdiction that commands that a person be informed of his suspect status in addition to his *Miranda* warnings or that requires automatic suppression of a statement in the absence of a suspect warning." *Nyhammer*, *supra*, 197 N.J. at 406.

*Thomas*, 2013 WL 1688374, at *17–18.[3]

Here, Petitioner fails to demonstrate that the Appellate Division unreasonably applied, or reached a result contrary to, clearly established federal law. *See* 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) (noting that it is the petitioner's burden to demonstrate that he is entitled to habeas relief). First, Petitioner fails to point to, and the Court is unaware of, any United States Supreme Court precedent requiring that police must inform a person in custody of his status as a suspect or that a judge has issued a warrant to search him or his belongings prior to questioning him in order to satisfy his right against self-incrimination. (*See* Habeas Br. at 5–6; Reply at 18; Direct Appeal Br. at 56–59). Petitioner's references to *State v. A.G.D.* provide no support at this stage because that decision turned on New Jersey's common law privilege against self-incrimination, rather than a clearly established federal right. *See A.G.D.*, 835 A.2d at 298. In fact, the New Jersey Supreme Court recognized in *A.G.D.* that "the New Jersey common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." *Id.* at 297. Moreover, to the extent that Petitioner asserts that the trial court misapplied New Jersey state law, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted).

Second, the Appellate Division's determination was consistent with federal law. At the federal level, for an accused's in-custody statement to be admissible at his criminal trial during the

---

[3]    Because the New Jersey Supreme Court summarily denied Petitioner's petition for certification on direct appeal, (*see* D.E. No. 6-6), this Court "look[s] through" the summary denial and applies Section 2254(d)'s standards to the Appellate Division's determination on direct appeal for Grounds One through Ten. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)).

prosecution's case in chief, police must provide him *Miranda* warnings[4] and he must give the statement voluntarily.  *See Dickerson v. United States*, 530 U.S. 428, 433–34 (2000).  The voluntariness inquiry takes into consideration the totality of the circumstances, including the characteristics of the accused and the details of the interrogation, and inquires into whether the accused's will was overborne.  *Id.*  In determining that the trial court properly admitted Petitioner's statements to police, the Appellate Division found that police administered *Miranda* warnings and considered Petitioner's lack of knowledge of the warrants and his status as a suspect, but ultimately decided that it was merely one of many factors to be analyzed and, therefore, not determinative in gauging the voluntariness of Petitioner's statements.  *Thomas*, 2013 WL 1688374, at *18.  This is consistent with the federal approach of determining the admissibility of Petitioner's statements. *See Dickerson*, 530 U.S. at 534.  Accordingly, Petitioner is not entitled to habeas relief on this argument.

### iii.     Argument Three: Request for Counsel

Petitioner's third argument in ground one is that the trial court should have suppressed his statements to police because they disregarded his request for counsel prior to making them. (Habeas Br. at 7).  Petitioner alleges that he "explicitly asked when he would get a public defender" and that the "questioning of [] Petitioner should have ceased until he had an opportunity to confer with counsel."  (*Id.*).

In *Miranda*, the Supreme Court held that if the person subjected to custodial interrogation "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."  384 U.S. at 444–45.  "Law enforcement officers

---

4       *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding that an individual held for interrogation must be clearly informed that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires).

must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States*, 512 U.S. 452, 454 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)).

However, "if the suspect is 'indecisive in his request for counsel,' the officers need not always cease questioning." *Id.* (quoting *Miranda*, 384 U.S. at 474). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

The Appellate Division reviewed this claim on direct appeal and affirmed the trial court's determination that Petitioner did not request counsel, ambiguously or otherwise. *Thomas*, 2013 WL 1688374, at *18–20. The Appellate Division explained:

> "[T]he trial judge noted that [Petitioner] made a general inquiry of Smith to ascertain if Smith knew what was going to happen to him. Smith told [Petitioner] that at some point he would be brought to the correctional facility in Morris County, as opposed to Essex County, that arrangements for a public defender could be made at the jail, and at one point, stated in a day or two.
>
> The judge found that Smith was the one that brought up the subject of the public defender, that [Petitioner] did not bring it up, nor did [Petitioner] ask for a lawyer. The judge found that [Petitioner] merely echoed the information about the process that Smith described to him when he said, "who do I get when I get to the county, a public defender?" The judge determined that this statement did not have to be clarified. The judge also found that [Petitioner]'s statement fell short of the type of statement which would trigger an obligation on the police to cease asking questions or clarify an ambiguity.

*Id.* at 18. The Appellate Division then reasoned:

> As initially articulated in *Miranda*, if the accused 'indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.' *Miranda*, *supra*, 384 U.S. at 444–45, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707.

18

> Once a request for counsel has been made, an interrogation may not continue until either counsel is made available or the suspect initiates further communication sufficient to waive the right to counsel. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1884–85, 68 L. Ed. 2d 378, 386 (1981). . . .

> Not every reference to a lawyer will require a halt to questioning. In *State v. Messino*, 378 N.J. Super. 559 (App. Div.), certif. denied, 185 N.J. 297 (2005), the defendant effectively asked the officer for advice, asking "[d]o you think I need a lawyer?" *Id.* at 573. The officer told the defendant it was his responsibility to tell him he had a right to a lawyer but "that was his call." *Ibid.* We held that, unlike such statements as, "Maybe I should have an attorney," *Maglio v. Jago*, 580 F.2d 202, 203 (6th Cir. 1978), or "I had better talk to a lawyer," *United States v. Clark*, 499 F.2d 802, 805 (4th Cir. 1974), the defendant's request for advice was not an assertion of the right to counsel. *Messino*, *supra*, 378 N.J. Super. at 578."

> . . . .

> [Petitioner]'s understanding of his rights was clear and complete. The words [he] chose were not ambiguous assertions of any of those rights but instead were merely echoes of the information about the process that Smith described to him. In sum, we see no basis to disturb the trial judge's finding that [Petitioner] did not invoke his right to counsel at any time.

*Id.* at *19.

The Appellate Division's decision that Petitioner did not request counsel, ambiguously or otherwise, was not based on an unreasonable determination of the facts. First, Petitioner fails to rebut any of the individual factual determinations that the Appellate Division adopted with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Although Petitioner maintains that he "explicitly asked when he would get a public defender," Petitioner fails to point to any evidence in support. (*See* Habeas Br. at 7). Accordingly, this Court presumes the Appellate Division's individual factual determinations are correct. *See Rountree v. Balicki*, 640 F.3d 530, 541–42 (3d Cir. 2011); *see also* 28 U.S.C. § 2254(e)(1).

Second, the totality of the evidence indicates that the Appellate Division's decision was

reasonable. *See Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004) ("[Section] 2254(d)(2)'s reasonableness determination turns on a consideration of the totality of the 'evidence presented in the state-court proceeding[]' . . . .").  Detective Smith testified at the *Miranda* hearing regarding his conversation with Petitioner on November 18, 2003, immediately preceding Petitioner's videotaped interview.  (D.E. No. 6-18, July 18, 2005 Miranda Hr'g Tr., at 40:24–42:9).  Detective Smith testified that Petitioner "wanted to know what was going to happen that day" and that Smith explained the procedure, including that "at some point we're going to take you to the jail, and there the arrangements will be made to get a public defender."  (*Id.*).  Detective Smith further testified that he, not Petitioner, first mentioned the public defender and that his mention of the public defender was not in response to any specific request from petitioner for an attorney.  (*Id.*).  Shortly thereafter, the videotaped interview of Petitioner begun.  (*See id.*).  A transcript of the interview indicates that, at the very beginning of the interview, Petitioner asked, "Who do I get when I get to the County?  A Public Defender?," to which Detective Smith replied, "Yeah. Yeah."  (D.E. No. 7-2, Interrogation Tr., at 2:5–7).  Thus, the Appellate Division's determination that Petitioner did not invoke his right to counsel was supported by the record and not based on an unreasonable determination of the facts.

Moreover, even if the Appellate Division's finding that Petitioner had not requested counsel was unreasonable, Petitioner's reference to a public defender was, at most, an ambiguous request for counsel for which, under federal law, the police need not cease questioning him.  *See Berghuis*, 560 U.S. at 381.  For these reasons, Petitioner is not entitled to habeas relief based on his third argument.

### iv.    Argument Five: Voluntariness of Petitioner's Statements

In Petitioner's fifth argument, he contends that his statements to police were not voluntarily

made but rather the product of coercive interrogation tactics, including an interrogation that lasted

for over two days and officers advising him that they would "speak up for him" with the prosecutor.

(Habeas Br. at 8).  The Appellate Division rejected this argument on direct appeal.  *See Thomas*,

2013 WL 1688374, at *16–17.  It analyzed the argument as follows:

> Our Supreme Court examined whether a defendant was subject to
> substantial psychological pressure in *State v. Cook*, 179 N.J. 533,
> 847 A.2d 530 (2004).   There, a twenty-four-year-old man was
> interrogated over a two-day period for his connection in the death of
> a fifteen-year-old girl.  *Id.* at 542-46.  The defendant was repeatedly
> read his Miranda rights, although the interrogation was
> frequently interrupted by breaks for the defendant to eat, sleep, smoke
> cigarettes, and compose himself after certain emotional outbursts.
> *Id.* at 543-45.  Ultimately, the defendant admitted to killing the girl,
> which the police memorialized in a written statement.  *Id.* at 545.  At
> the defendant's Miranda hearing, the court found that the defendant
> had understood his Miranda warnings, and that he had knowingly
> and intelligently waived his rights.  *Id.* at 546.  We affirmed, as did
> the Supreme Court, which, upon analyzing whether the defendant's
> will was overborne, held that the trial court properly considered the
> totality of the circumstances, including both the characteristics of
> the defendant and the nature of the interrogation.  *Id.* at 562-65.

> "Promises made by law enforcement are . . . relevant [to a
> determination of voluntariness]: where a promise is likely to 'strip[]
> defendant of his capacity for self-determination' and actually induce
> the incriminating statement, it is not voluntary." *State v. Fletcher*,
> 380 N.J. Super. 80, 89, 880 A.2d 1171 (App. Div. 2005) (quoting
> *State v. Pillar*, 359 N.J. Super. 249, 272-73, 820 A.2d 1 (App. Div.),
> *certif. denied*, 177 N.J. 572, 832 A.2d 322 (2003)) (internal
> quotations omitted).

> We are satisfied that the police officers' promises to [Petitioner] to
> "speak up for him" with the prosecutors did not reach the level of
> overbearing [Petitioner]'s will and coercing his confession.  The
> officers' statements were clearly made in the context of their
> attempts to appear sympathetic and understanding to [Petitioner].  In
> the absence of "very substantial" psychological pressure by the
> officers, we cannot conclude that [Petitioner]'s will was overborne.
> See *Galloway*, supra, 133 N.J. at 656.

> Here, the trial judge's determination is consistent with the principles
> in *Cook*, *Galloway*, and *Fletcher*, and we discern no reason to

21

overturn his decision on the basis asserted by [Petitioner].

*Id.*

Here, Petitioner once again fails to demonstrate that the Appellate Division unreasonably applied, or reached a result contrary to, clearly established federal law.  *See* 28 U.S.C. § 2254(d); *see also Richter*, 562 U.S. at 103.  Petitioner points to the Supreme Court's decision in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) for the proposition that a court must consider the totality of the circumstances in assessing whether a defendant gave his statements voluntarily.  (*See* Reply at 22).  However, Petitioner fails to demonstrate how the Appellate Division's determination was an unreasonable application of, or contrary to, that decision or any other federal law.  (*See id.*).

In fact, in affirming the trial court's rejection of Petitioner's claims, the Appellate Division considered the totality of the circumstances.  *Thomas*, 2013 WL 1688374, at *16–17.  This is evident by the Appellate Division's comparison of the facts in this case to the facts in *State v. Cook*, 847 A.2d 530 (N.J. 2004), which involved a similarly aged man who, like Petitioner, had been interrogated over a two-day period with breaks to eat and sleep and was repeatedly read his *Miranda* rights.  *Id.* at *16.  The Appellate Division also properly considered whether the police officer's promises to Petitioner to "speak up with the prosecutor" rendered Petitioner's statements involuntary.  *Id.*  Finally, as noted above, the Appellate Division considered that police administered *Miranda* warnings and considered Petitioner's lack of knowledge of the warrants and his status as a suspect.  *Id.* at *18.  Accordingly, the Appellate Division's determination was consistent with federal law.  *See Bustamonte*, 412 U.S. at 226.

Moreover, the Appellate Division's adoption of the trial court's finding that the confession was voluntary was not based on an unreasonable determination of the facts.  The totality of the evidence shows that Petitioner voluntarily agreed to go with police for questioning.  (D.E. No. 11-

1 at 74:14–16).  Petitioner waived his *Miranda* rights four separate times, made his first statement shortly after the interrogation began, and was given breaks to sleep, eat, and make phone calls. (*See generally id*.).  The record does not support a conclusion that Petitioner's will was in any way overborne, nor a conclusion that Petitioner's statements to the police were in any way coerced or the result of improper police conduct.  Accordingly, Petitioner is not entitled to habeas relief based on his fifth argument.

### B.      Ground Two: Peremptory Challenge

In ground two, Petitioner argues that the State exercised a peremptory challenge to strike the only prospective African-American juror in violation of Petitioner's constitutional rights. (Habeas Br. at 10–12).  Petitioner's argument, in essence, is that the peremptory challenge violated his rights under the Equal Protection Clause of the Fourteenth Amendment, which forbids a state from exercising peremptory challenges on the basis of race.  *See Batson v. Kentucky*, 476 U.S. 79, 84 (1986).

Petitioner raised this argument on direct appeal.  The Appellate Division summarized the relevant record as follows:

> The prosecutor explained that the excused juror had indicated that he believed African Americans were treated disparately in the criminal justice system.  On the jury questionnaire, the excused juror did not answer a number of questions, thus he did not follow the court's instructions.  The prosecutor noted that when asked by the judge if he read the questionnaire, the juror's his [sic] first words were, not really.  The prosecutor was also concerned that the excused juror had been a corrections officer for twenty-seven years, having had contact on a daily basis with prisoners.  Based on his experience with internal-affairs prison-issues, the prosecutor believed that prison guards tend to identify or tend to be more sympathetic with prisoners.  The prosecutor also noted that after twenty-seven years as a senior corrections officer, the excused juror left his job without retiring which struck him as very unusual since he had a pension and did not wait to retire until the pension matured.

*Thomas*, 2013 WL 1688374, at *23.  Based on this record, the Appellate Division affirmed the trial court's decision because the prosecutor provided specific, race-neutral reasons for removing the juror in question.  *Id.*

The Appellate Division's determination was neither contrary to nor an unreasonable application of clearly established federal law.  The Supreme Court set forth the three-part test to determine whether a peremptory challenge is unconstitutionally based on race in *Batson*.  *See Batson*, 476 U.S. at 96.  First, a defendant must show that a peremptory challenge has been exercised on the basis of race.  *See id.*  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  *Id.*  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.  *Id.*

Here, the Appellate Division applied a comparable three-prong test under state law. *Thomas*, 2013 WL 1688374, at *20–23 (citing *State v. Gilmore*, 511 A.2d 1150 (N.J. 1986)). Applying that test, the Appellate Division determined that the peremptory challenge was constitutional because the record demonstrated that the prosecutor had provided credible, race-neutral reasons for removing the juror and Petitioner failed to demonstrate purposeful discrimination.  *See id.* at *23.  For example, the prosecutor had stated his concerns about the nature of the juror's employment and the juror's disregard for the judge's instructions on the questionnaire.  *Id.*  This determination is consistent with *Batson* and supported by the record.  (*See* D.E. No. 6-64, May 29, 2008 Trial Tr., at 29:7–32:8; D.E. No. 6-45, Voir Dire of P.L., at 4:7–17, 9:14–24 & 14:11–18:20); *see, e.g.*, *Cooper v. Hendricks*, No. 04-5055, 2005 WL 3307265, at *12 (D.N.J. Dec. 6, 2005) (denying *Batson* claim in habeas petition where the prosecutor provided a race-neutral explanation for exercising the peremptory challenges, which the trial court accepted,

and which, from the record, appear to have been genuine).  Thus, Petitioner is not entitled to habeas relief on ground two.

### C.       Ground Three: Admission of Other Crimes Evidence

In ground three, Petitioner argues that the trial court erred in allowing the state to introduce other crime/bad acts evidence, notwithstanding N.J.R.E. 404(b) and N.J.R.E. 403, in violation of his right to a fair trial.  (Habeas Br. at 12–13).  Specifically, Petitioner asserts that the state's use of (i) Petitioner's statement regarding his purchase and ownership of a gun of the same model as the one used in the shooting[5] and (ii) Petitioner's statement regarding a discussion he had with Rock and Joey about robbing a Best Buy store,[6] were grossly prejudicial to him.  (*Id.*).

To the extent that ground three now raises a federal due process claim, Petitioner failed to exhaust it.  A federal court may not grant a writ under § 2254 unless the petitioner has first "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); *see also Rose v. Lundy*, 455 U.S. 509, 515 (1982); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997), *cert. denied*, 532 U.S. 919 (2001).  To meet the exhaustion requirement, a petitioner must "fairly present," his federal claims to each level of the state courts empowered to hear them, either on

---

[5]      The full statement at issue regarding the gun Petitioner owned is:

> My family owned guns and stuff like that, but, you know, I purchased one, it was a black 25.  It looked like the same 25 that you recover [sic] from my house, but it's a black one.  The same model, the same six shots and whatnot, but you know.

(D.E. No. 7-2 at 61:14–18).

[6]      The main statement at issue regarding the Best Buy robbery is:

> And [Rock, Joey, and a man named Mauley] threw a situation out there, you know, and I threw a situation out there.  The situation I threw out there I said, "Best Buy."  They said, "What about Valley Fair?"  You know, Valley Fair, you know, it has games and stuff and what not and everything.  And I said you make more money on plasma TVs.  They go for seven, $8,000.

(D.E. No. 7-2 at 9:10–16).

direct appeal or in collateral post-conviction proceedings.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999).  This means that the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts [the state courts] on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  "It is not sufficient that all the facts necessary to support the federal claim were before the state courts." *Anderson v. Harless* 459 U.S. 4, 6 (1982).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981))).  A petitioner generally bears the burden to prove all facts establishing exhaustion.  *See Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993).

Here, Petitioner did not give the state courts "fair notice" that he was asserting a federal constitutional claim in addition to, or instead of, a claim that the trial court violated state rules of evidence.  Petitioner's briefing cites numerous state law cases based on state law but fails to mention the federal Constitution or any judicial decision based on the federal Constitution.  (*See* Habeas Br. at 12–13).  Petitioner's passing reference to the concept of a "fair trial" was insufficient to put the state courts on notice that he was asserting a federal due process claim.  *See Keller v. Larkins*, 251 F.3d 408, 415 (3d Cir. 2001).

Nevertheless, a habeas court can, if appropriate, deny a petitioner's unexhausted claims on the merits pursuant to 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007).  Where, as here, the state courts have not "reached the merits of a claim thereafter presented to a federal habeas court," the federal court must "conduct a *de novo* review over pure legal questions and mixed questions of law and facts . . . ." *Id.* at 429.  Even on *de novo* review of a habeas claim, however, the state court's factual determinations are still presumed to be correct,

unless a petitioner rebuts them with clear and convincing evidence.  *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

Whether the purported evidentiary errors constituted a due process violation is a question of law, which this Court reviews *de novo*.  For a petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  *See Keller*, 251 F.3d at 413 (holding that admission of evidence may violate due process where the evidence is so inflammatory as to "undermine the fundamental fairness of the entire trial"); *Bisaccia v. Attorney General*, 623 F.2d 307, 313 (3d Cir. 1980) ("When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law.").

Here, Petitioner fails to demonstrate how the trial court's supposed errors rose to the level of a due process violation.  (*See* Habeas Br. at 12–13).  Petitioner asserts that the admitted statements were "unnecessary" and "grossly prejudicial."  (*Id.* at 13).  The Court disagrees.  The Best Buy statement, which suggested that Petitioner engaged in a *quid pro quo* agreement with Rock and Joey to commit multiple robberies, was relevant to assessing the motive for the FuncoLand robbery, (*see* D.E. No. 6-46, June 2, 2008 Trial Tr., at 5:13–6:10), and the trial court mitigated any prejudicial effect by issuing a limiting instruction, (*see* D.E. No. 6-65, July 23, 2008 Trial Tr., at 31:21–33:14).  The statement regarding Petitioner's purchase and ownership of a gun of the same model as the one used in the shooting was probative of Petitioner's knowledge of that model's risk of accidental discharge, which, in turn, was relevant to the recklessness element of the lesser included offenses of aggravated and reckless manslaughter.  (*See* D.E. No. 6-64 at 38:1–44:2).  This statement was not grossly prejudicial to Petitioner because it did not state that he

purchased or used the gun illegally.  (*See* D.E. No. 6-49, June 11, 2008 Trial Tr., at 230:18–20).
The Court, therefore, cannot say that these statements' prejudicial value so greatly outweighed
their probative value as to violate Petitioner's due process rights.  *See Bisaccia*, 623 F.2d at 313.
Accordingly, the trial judge's evidentiary rulings did not violate Petitioner's due process rights,
and Petitioner is not entitled to relief on ground three.

### D.      Ground Four: Rule of Completeness Claim

In ground four, Petitioner argues that the trial court erroneously interpreted the rule of
completeness to exclude some of Petitioner's exculpatory statements to the police while admitting
Petitioner's confession.  (Habeas Br. at 13–15).  Under the rule of completeness, "[w]hen a writing
or recorded statement or part thereof is introduced by a party, an adverse party may require the
introduction at that time of any other part or any other writing or recorded statement which in
fairness ought to be considered contemporaneously."  *See* N.J.R.E. 106.

Specifically, Petitioner maintains that the trial court should have permitted him to admit
his hearsay statement that "he did not shoot anyone" that he made to Detective Dangler hours
before Petitioner ultimately confessed to the shooting during the videotaped interrogation.  (*See*
Habeas Br. at 13–15).  Petitioner contends that this statement, which he attempted to admit through
Detective Dangler's testimony during direct examination, is necessary under the rule of
completeness to properly evaluate his subsequent confession during the interrogation.  (*Id.* at 15).
Petitioner also asserts that the trial court should have permitted him to cross-examine Rock
regarding a statement made by Joey.  (*Id.* at 14).

The Court liberally construes this argument as asserting that the trial court violated

Petitioner's Fifth Amendment right against self-incrimination[7] by admitting into evidence Petitioner's confession without context and denying his request under the rule of completeness to admit his prior contradictory statement that "he did not shoot anyone." (*See id.* at 13–15). In other words, Petitioner contends that the trial court forced him to choose between allowing Petitioner's confession to stand unchallenged and out of context or to waive his rights against self-incrimination and testify.[8] (*See id.*)

On direct appeal, the Appellate Division affirmed the trial court's rulings regarding the admissibility of Petitioner's statements. *Thomas*, 2013 WL 1688374, at *24–26. The Appellate Division reasoned that the rule of completeness is not a catch-all that allows a defendant to admit his or her own self-serving hearsay statements and, thereby, avoid testifying and cross examination. *Id.* at *25. Accordingly, the Appellate Division determined that the trial court properly exercised its discretion and did not err by refusing to admit Petitioner's statement to Detective Dangler because it was a self-serving hearsay statement that did not fall into any recognized hearsay exception. *Id.* Finally, the Appellate Division affirmed the trial court's decision disallowing Petitioner's cross-examination of Rock regarding hearsay statements made by Joey. *Id.* at *26.

Here, Petitioner fails to demonstrate that the Appellate Division's determinations were contrary to, or an unreasonable application of, clearly established federal law as established by the holdings of the United States Supreme Court. *See* 28 U.S.C. § 2254(d); *see also Richter*, 562 U.S. at 103. Although Petitioner cites to Third Circuit caselaw that supports his argument that exclusion

---

[7]      The Fifth Amendment of the United States Constitution, as incorporated and made applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[8]      The Court finds that Petitioner fairly presented this claim to the state courts. *See O'Sullivan*, 526 U.S. at 847; (*see also* Direct Appeal Br. at 84 (citing federal decisions analyzing purported violations of the rule of completeness doctrine under the Fifth Amendment)).

of an exculpatory portion of a defendant's confession may implicate the Fifth Amendment, (*see* Direct Appeal Br. at 84 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984), *cert. denied*, 469 U.S. 1161 (1985)), Petitioner fails to point to, and the Court is unaware of, any United States Supreme Court precedent that would have required the trial court to admit the statements under the Fifth Amendment or doctrine of completeness notwithstanding the fact that they contained hearsay. (*See* Habeas Br. at 13–15; Reply at 28). Accordingly, Petitioner is not entitled to habeas relief on ground four.

### E.  Ground Five: Judicial Bias

Ground five asserts that certain judicial conduct deprived Petitioner of his rights to a fair trial, to due process, and to confront witnesses. (Habeas Br. at 15–16; Reply at 29–31). Petitioner points to four specific examples of this alleged judicial bias. (*See* Habeas Br. at 15–16).

First, Petitioner takes issue with a statement the trial judge made to the jury regarding an order for a GPS tracking device. (Habeas Br. at 15). During defense counsel's cross-examination of Deputy Chief James Gannon, defense counsel asked him who prepared a GPS tracking order that the trial judge ultimately signed. (D.E. No. 6-52, June 18, 2008 Trial Tr., at 113:12–13 & 113:20–21). The prosecutor objected to that question. (*Id.* at 113:9–24). The trial judge sustained the objection and informed the jury that it does not matter who physically prepares a court order, because the judge will not sign it if it does not contain what the judge is specifically ordering. (*Id.* at 114:3–18).

Second, Petitioner argues that during defense counsel's cross-examination of Rock, the trial judge inappropriately noted the state's sentencing recommendation but stated that sentencing is up to the judge. (Habeas. Br. at 15). Defense counsel cross-examined Rock regarding his plea agreement and the state's sentence recommendation for him. (D.E. No. 6-59, July 7, 2008 Trial

Tr., at 155:7–156:9).  Following the prosecutor's objection, the trial court explained to the jury that the trial judge makes the ultimate decision at sentencing, even though the state's recommendation was "20 years with 17 years [of parole ineligibility under] the No Early Release Act."  (*Id.* at 160:5–13).

Third, Petitioner argues that the trial judge improperly instructed the jury that "the police had no duty to record statements of Petitioner and had no duty to inform the person that their statement might be recorded."[9]  (Habeas Br. at 15).  The trial court instructed the jury as follows:

> [T]he police have no duty to record the statements of [Petitioner.]
> Law enforcement had no duty to inform a person that a statement
> might be recorded.  However, you may consider the failure to
> record the statement or the failure to inform [Petitioner] he was
> going to be recorded in assessing whether the statements alleged
> to have been made to law enforcement are credible or reliable.  It
> is your function to determine whether or not these statements were
> actually made by [Petitioner] and, if made, whether the statement
> or statements or any portion of them are credible.

(D.E. No. 6-65 at 28:17–29:3).

Fourth, Petitioner argues that the trial court limited the cross-examination of certain key witnesses, including (i) Dennis Davenport and Brian Bordinaro regarding their out of court identifications; (ii) Deputy Chief Gannon regarding his knowledge about the FuncoLand investigation and statements made by the Petitioner; (iii) Lt. Simonetti regarding the Petitioner's arrest affidavit; (iv) portions of the mall tape; and (v) questions to Rock about what the investigating detectives told him about what others had said.  (Habeas Br. at 16).

The Appellate Division denied these arguments on direct appeal as meritless.  *See Thomas*, 2013 WL 1688374, at *23–24.  The Appellate Division noted that throughout the trial the judge approached both sides fairly, which included sustaining defense counsel objections.  *Id.* at *24.  It

---

[9]     Petitioner also alleges that the trial court inappropriately instructed the jury on the burden of proof.  (Habeas Br. at 15–16).  Because Petitioner also raises this issue in ground nine, the Court addresses it below.

also found that the phrasing of the judge's rulings sustaining those objections neutralized any negative impression the jury may have obtained as a result of the judge's colloquies with defense counsel concerning evidential objections. *Id.* Moreover, the Appellate Division explained that in the trial court's limiting instructions, the "judge specifically referred to facts injected in the record by both the prosecutor and defense counsel that might differ from the jury's recollections of the trial testimony." *Id.* Regarding Petitioner's allegation that the trial judge improperly limited cross-examination of certain witnesses, the Appellate Division found that defense counsel had ample opportunity to cross-examine the state's witnesses. *Id.* The Appellate Division stated that the trial judge's comments did not breach the judicial conduct standard or prejudice Petitioner. *Id.* Finally, the Appellate Division ruled that the trial judge's conduct was not biased in favor of the prosecutor. *Id.*

"Federal habeas review of the alleged bias of a state court judge is confined to the narrow question of whether the petitioner's right to due process has been violated." *Wheeler v. Vaughn*, No. 01-0428, 2004 WL 73728, at *13 (E.D. Pa. Jan. 6, 2004); *see also United States v. Wilensky*, 757 F.2d 594, 598 (3d Cir. 1985). In a habeas court's review of a state court conviction, "the proper inquiry is whether the judge's conduct 'pervaded the overall fairness of the proceeding.'" *United States v. Holder*, 348 F. App'x 762, 764 (3d Cir. 2009) (quoting *Wilensky*, 757 F.2d at 598). A habeas court must "determine whether the trial judge's conduct was so prejudicial that it deprived [the defendant] 'of a fair, as opposed to a perfect, trial.'" *Id.* (quoting *United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1983)).

In the present case, Petitioner fails to demonstrate that the trial judge's conduct was so prejudicial that it deprived Petitioner of a fair trial. (Habeas Br. at 15–16; Reply at 29–31). Petitioner fails to allege or explain how the trial judge's instructions were incorrect. (Habeas Br.

at 15–16; Reply at 29–31).  Petitioner simply lists the judge's statements and instructions without explaining how they deprived him of a fair trial or due process.  (Habeas Br. at 15–16; Reply at 29–31).  Additionally, Petitioner fails to make any argument regarding how the court limited the cross-examination of certain witnesses or why any limitation was improper.  (Habeas Br. at 15–16; Reply at 29–31).  Thus, Petitioner fails to demonstrate that the judge's conduct pervaded the overall fairness of the proceeding.  *See Wilensky*, 757 F.2d at 598; *see also Richter*, 562 U.S. at 103 (noting that it is the petitioner's burden to demonstrate that he is entitled to habeas relief).

With respect to Petitioner's claim that the trial judge violated Petitioner's right to confront witnesses, the Appellate Division's determination was not contrary to, nor an unreasonable application of, clearly established federal law.  The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This includes the defendant's right to test the credibility of witnesses through cross-examination.  *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination . . . which is the principal means by which the believability of a witness and the truth of his testimony are tested.").

This right, however, is not unlimited.  The Constitution does not bar the exclusion of evidence through the application of state evidentiary rules that serve the interests of fairness and reliability.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Thus, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Here, Petitioner fails to explain how the Appellate Division's determination constitutes an

unreasonable application of this law. (*See* Habeas Br. at 15–16; Reply at 29–31). Accordingly, Petitioner's claim fails, and he is not entitled to habeas relief on this ground.

### F.    Ground Six: Sequestration Order Violation

In ground six, Petitioner contends that the prosecution's violation of a sequestration order denied him a fair trial. (Habeas Br. at 17–19). Specifically, Petitioner maintains that Assistant District Attorney McNamara ("Prosecutor McNamara") violated the sequestration order prohibiting witnesses from speaking to each other by discussing with Sergeant Rice what another witness, Sergeant DeGroot, had testified. (*Id.*).[10]

Sergeant Rice had previously prepared an affidavit that addressed what DeGroot and Detective Driscoll had told him regarding their interview with Rock. (*See* D.E. No. 6-61, July 10, 2008 Trial Tr., at 105:16–113:6). The affidavit indicated that Rock told DeGroot and Driscoll that he was present when Petitioner killed both decedents. (*See id.*). On cross-examination, however, Sergeant Rice testified that his affidavit's reference to both "decedents" was a typographical error, and that it should have said "decedent." (*Id.*) Sergeant Rice also testified that he realized his mistake for the first time the night prior, when he spoke to Prosecutor McNamara about it. (*Id.*). Petitioner contends that Prosecutor McNamara violated the sequestration order that night by telling Rice that DeGroot had testified that Rock said that he was present inside the store only when one decedent was shot, not both. (*See* Habeas Br. at 17–19).

Based upon this Court's review of Petitioner's briefs to the state courts, Petitioner failed to "fairly present" a federal claim based on these allegations. *See McCandles*, 172 F.3d at 261. Because Petitioner failed to put the Appellate Division on notice that he was raising a federal claim with respect to the alleged sequestration order violation, the Appellate Division considered

---

[10]    The trial testimony refers to Sergeants Rice and DeGroot as "Detective," "Sergeant," and "Lieutenant." The Court uses "Sergeant" for the purposes of this Opinion.

N.J.R.E. 615 and applied state law in its analysis.  *See Thomas*, 2013 WL 1688374, at *30–31.

Therefore, ground six has not been fully and properly exhausted in the state courts as required by

§ 2254.  *See O'Sullivan*, 526 U.S. at 844–45.

Nevertheless, the Court will consider Petitioner's unexhausted claim on the merits.  *See*

*Taylor*, 504 F.3d at 427.  Whether there has been a violation of a sequestration order that amounts

to a due process violation presents mixed questions of law and fact.  *See, e.g.*, *Johnson v. Weber*,

No. 05-4062, 2006 WL 704842, at *19 (D.S.D. Mar. 18, 2016) (addressing both the factual finding

of the trial court as to whether a sequestration order violation occurred and the legal question of

whether a violation of the order amounted to a due process violation).  Accordingly, the Court

reviews this claim *de novo*, *Taylor*, 504 F.3d at 429, but it presumes the state court's factual

determinations are correct.  *Appel*, 250 F.3d at 210.

Here, the trial court found that the alleged sequestration order violation was mere

speculation.  (D.E. No. 61 at 112:13–113:6).  Petitioner fails to rebut this finding with clear and

convincing evidence.  (*See* Habeas Br. at 17–19).  Instead, Petitioner merely rehashes the same

arguments that the trial court found to be speculative.  (*See id.*).  Absent clear and convincing

evidence, the Court must accept the trial court's finding that Petitioner failed to establish a

sequestration order violation as correct.  *Appel*, 250 F.3d at 210.  Accordingly, because Petitioner

bases his claim on the existence of a sequestration order violation and none occurred, the claim

necessarily fails.  Thus, the Court denies ground six of the Petition.

### G.    Ground Seven: Omitted Jury Instructions

In ground seven, Petitioner contends that the trial court denied him a fair trial because the

court failed to provide proper and accurate instructions to the jury.  (Habeas Br. at 21–23).

Petitioner maintains that the court improperly declined defense counsel's request for a full

causation charge on count one, charging Petitioner with first-degree murder of Jeffrey Eresman, and a *Clawans* charge.[11]  (Habeas Br. at 21–23).

In instructing the jury on count one, the trial court stated that the "State is required to prove . . . beyond a reasonable doubt . . . that the defendant caused Jeffrey Eresman's death . . . or caused serious bodily injury that then resulted in [] Mr. Eresman's death . . . ."  (D.E. No. 6-65 at 38:5–12).  The trial court explained that "as to Count 1, . . . [y]ou must find that [Eresman] would not have died but for defendant's conduct."  (*Id.* at 45:15–19).  The trial court further explained that with respect to purposeful or knowing murder, "causing death or serious bodily injury resulting in death[] must [sic] within the design or contemplation of the defendant."  (*Id.* at 42:8–11).

The Court construes Petitioner's argument as asserting that the trial court should have provided an expanded jury instruction on the legal meaning of causation.[12]  The basis for his argument is that the medical examiner had testified that Jeffery Eresman suffered two gunshot

---

[11]     Under *State v. Clawans*, 183 A.2d 77 (N.J. 1962), a court may charge a jury that it may take an adverse inference from the non-production of a witness if (i) the uncalled witness is peculiarly within the control or power of only one party, or there is a special relationship between a party and the witness or a party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (ii) the witness is available to that party both practically and physically; (iii) the testimony of the uncalled witness will elucidate relevant and critical facts in issue; and (iv) such testimony appears to be superior to that already utilized in respect to the fact to be proven. *State v. Hickman*, 499 A.2d 231, 234 (N.J. Super. Ct. App. Div. 1985).

[12]     Although Petitioner does not specify what additional language the trial court should have provided the jury, the Court notes that the New Jersey Model Jury Charge for murder provided for an expanded causation charge if the causal relationship between the conduct and the result was an issue.  *See* Model Jury Charge (Criminal), "Murder N.J.S.A. 2C:11-3a(1) and 3a(2)" (2004).  In those circumstances, the model charge read as follows:

> Causation has a special meaning under the law.  To establish causation, the State must prove two elements, each beyond a reasonable doubt:  First, that but for the defendant's conduct, the victim would not have died.  Second, (insert victim's name) death must have been within the design or contemplation of the defendant. If not, it must involve the same kind of injury or harm as that designed or contemplated, and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.  In other words, the State must prove beyond a reasonable doubt that (insert victim's name) death was not so unexpected or unusual that it would be unjust to find defendant guilty of murder.

*Id.*

wounds to the head, both of which were lethal, and that the first one would have rendered the victim instantaneously unconscious.  (*Id.* at 22).  Petitioner maintains that Joey stated that he shot Eresman first and that Petitioner shot Eresman second.  (*Id.* at 21).  Petitioner contends that the trial court should have provided an expanded instruction on causation because Eresman had already been shot, which would have led to his death notwithstanding Petitioner's actions; thus, Petitioner could not be causally responsible for his death.  (*Id.* at 21–22).

Petitioner also argues that he was entitled to a *Clawans* charge to instruct the jury that it may draw an adverse inference from the state's failure to call co-defendant Joey as a witness. (Habeas Br. at 22–23).  Petitioner argues that Joey provided a statement to police inculpating Petitioner as the sole shooter.  (*Id.* at 22).  Petitioner claims that the state chose not to call Joey because he recanted this sworn statement.  (*Id.*).  Accordingly, Petitioner maintains that the court should have instructed the jury that it may draw an adverse inference from the state's failure to call his co-defendant.  (*Id.*).

To the extent Petitioner asserts a due process violation under the federal Constitution, Petitioner failed to "fairly present" this claim to the state courts.  Petitioner's direct appeal briefing relies on state law and fails to mention the federal Constitution or any judicial decision based on the federal Constitution.  (*See* Direct Appeal Br. at 83–90).  As noted above, Petitioner's passing reference to the concept of a "fair trial" is insufficient to put the state courts on notice of a federal due process claim.  *See Keller*, 251 F.3d at 415.

The Court will, nonetheless, consider Petitioner's unexhausted claim on the merits.  *See Taylor*, 504 F.3d at 427.  Federal court review of state court jury instructions is narrow and is limited to those instances where the instructions violated a defendant's due process rights.  *Echols v. Ricci*, 492 F. App'x 301, 312 (3d Cir. 2012) (citing *Estelle*, 502 U.S. at 71–72 (holding that

"[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process")); *see also Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (same). To show that certain jury instructions violated due process, a habeas petitioner must "point to a federal requirement that jury instructions . . . must include particular provisions," *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997), demonstrate that the jury "instructions deprived him of a defense which federal law provided to him," *id.*, or demonstrate that the instructions operated to lift the burden of proof on an essential element of an offense as defined by state law. *See Smith*, 120 F.3d at 416; *see also Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Here, Petitioner fails to demonstrate that the allegedly deficient or omitted jury instructions violated his due process rights. Petitioner fails to point to any federal requirement that the trial court should have elaborated on the legal meaning of causation or included a *Clawans*-like charge. (*See* Habeas Br. at 21–23; Reply at 34). Petitioner also fails to argue that the lack of a detailed causation instruction and denial of a *Clawans* charge deprived him of a defense that federal law provides. (*See* Habeas Br. at 21–23; Reply at 34).

Finally, Petitioner fails to demonstrate that the instructions operated to lift the burden of proof on an essential element as defined by state law. (*See* Habeas Br. at 21–23; Reply at 34). New Jersey law provides that conduct is the cause of a result when:

> (1)     It is an antecedent but for which the result in question would not have occurred; and
> (2)     The relationship between the conduct and result satisfies any additional causal requirements [including:]
> b.      When the offense requires that the defendant purposefully or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same

> kind of injury or harm as that designed or contemplated and
> not be too remote, accidental in its occurrence, or dependent
> on another's volitional act to have a just bearing on the
> actor's liability or the gravity of his offense.

N.J.S.A. § 2C:2-3 (2002).  The trial court's instructions on causation were consistent with this law

and did not operate to lift the state's burden of proof.  (*See* D.E. No. 6-65 at 38:5–12, 42:8–11 &

45:15–19).[13]  Petitioner's argument is therefore insufficient to warrant federal habeas relief.  For

the reasons explained above, ground seven is denied.

### H.    Ground Eight: Alleged *Brady* violation

Next, Petitioner argues that the prosecution's failure to inform him of impeaching

information violated the rule set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).  (Habeas Br. at

24–26).  Under *Brady*, a violation of a petitioner's due process rights occurs if "(1) the evidence

at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the

prosecution withheld it, and (3) the defendant was prejudiced because the evidence was

'material.'"  *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).  Evidence is material if there is

"a reasonable probability that, if the evidence had been disclosed, the result of the proceeding

would have been different."  *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009) (citing *Giglio v.

United States*, 405 U.S. 150, 154 (1972)).

 Petitioner argues that the State failed to advise him that one of its identification witnesses,

Kate Tschischik, received a copy of Petitioner's photo array and his photograph prior to testifying

---

[13]      If anything, the trial judge's omission of the expanded jury charge on causation made it more difficult to
convict Petitioner of purposeful or knowing murder.  The trial judge instructed the jury on purposeful or knowing
murder that "causing death or serious bodily injury resulting in death[] must [sic] within the design or contemplation
of the defendant."  (*Id.* at 42:8–11).  The inclusion of the expanded model jury instructions would have only added an
additional method by which the jury could have convicted him of purposeful or knowing murder, *i.e.*, by finding that
Eresman's death "involve[d] the same kind of injury or harm as that designed or contemplated, and [was] not [] too
remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the
defendant's liability or on the gravity of his/her offense."  *See* Model Jury Charge (Criminal), "Murder N.J.S.A. 2C:11-
3a(1) and 3a(2)" (2004).  Accordingly, any constitutional violation was harmless.

at the trial.  (*Id.* at 25).  After investigating, the State determined that it had inadvertently given

Tschischik the photo array and photograph during trial preparation.  (D.E. No. 6-59 at 4:22–24,

6:16–25, 9:13–20 & 13:6–9).  Petitioner moved for a mistrial, but the trial court denied the motion.

Rather, the trial court instructed the jury that "[t]o decide whether the identification testimony is

sufficiently reliable evidence . . . you may consider the following factors . . . [w]hether the witness

was told that the defendant was present in the courtroom or was given a copy of [Petitioner's]

photograph prior to their testimony in court."  (D.E. No. 6-65 at 20:24–25, 21:6–7 & 22:21–24).

Defense counsel also used this issue to discredit Tschischik during his summation.  (D.E. 6-63,

July 22, 2008 Trial Tr., at 39:7–20).[14]

The Appellate Division rejected Petitioner's argument on direct appeal.  *Thomas*, 2013 WL

1688374, at *29–30.  The court explained:

> Additionally, [Petitioner] contends that the judge should have
> granted his motion for a mistrial because Tschischik had a copy of
> the photo array and [Petitioner] did not learn this until her cross-
> examination.  All of the omitted materials were then promptly
> provided to [Petitioner].  In summation, defense counsel was able to
> discredit the credibility of Tschischik's in-court identification of
> [Petitioner] by reference to her possession of the photo array and
> [Petitioner]'s photo. The judge also gave a curative supplemental
> charge on identification, instructing the jury to consider whether the
> witness was told that [Petitioner] was present in the courtroom or
> was given a copy of [Petitioner]'s photograph prior to her testimony.
>
> . . . .
>
> [W]e conclude the measures taken by the trial judge adequately
> protected [Petitioner]'s right to a fair trial.

---

[14]    Petitioner also maintains that the State failed to disclose other information to him prior to his *Miranda*
hearing.  (*See* Habeas Br. at 24–25).  This argument does not warrant much discussion.  As the Appellate Division
correctly noted, Petitioner could not establish a *Brady* violation based on this information because he already knew it
from being personally involved in all the described instances from which the information originated.  *Thomas*, 2013
WL 1688374, at *29.  This determination is consistent with federal law.  *See United States v. Starusko*, 729 F.2d 256,
262 (3d Cir. 1984) ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he
already has . . . .").

> Additionally, [Petitioner] was aware of the information upon cross-examination of the witness and used it in summation.  No denial of due process occurs when *Brady* material is disclosed in time for its effective use at trial by defense counsel.  *Martini*, *supra*, 160 N.J. at 270 n.5; *United States v. Higgs*, 713 F.2d 39, 44 (3d. Cir. 1983), cert. denied, 464 U.S. 1048, 104 S. Ct. 725, 79 L. Ed. 2d 185 (1984).

> In any event, the other evidence against [Petitioner] was overwhelming and there is not a reasonable probability that, had the withheld discovery been disclosed to defense earlier, the result of the proceeding would have been different.

*Id*.

In rejecting this claim, the Appellate Division did not unreasonably apply, or reach a result contrary to, clearly established federal law.  As the Appellate Division correctly noted, under federal law, "[n]o denial of due process occurs if *Brady* material is disclosed to appellees in time for its effective use at trial." *Thomas*, 2013 WL 1688374, at *30 (citing *Higgs*, 713 F.2d at 44). Although Petitioner learned during cross-examination that Tschischik had received a photo array and photograph prior to trial, defense counsel was able to discredit Tschischik using this information in his summation.  (*See* D.E. No. 6-63 at 38:12–39:14).  Additionally, based on the strength of the evidence against Petitioner, including his confession and Rock's statement that he was involved in the shooting and robbery, and the trial court's instruction regarding the reliability of Tschischik's identification, (*see* D.E. No. 6-65 at 20:24–25, 21:6–7 & 22:21–24), there was no reasonable probability that, had the withheld discovery been disclosed to defense earlier, the result would have been different.  *See Giglio*, 405 U.S. 153–54.  Accordingly, Petitioner is not entitled to habeas relief on this ground.

## I.     Ground Nine: Motion for Mistrial

In ground nine, Petitioner argues that the trial court erred in denying Petitioner's motion for mistrial.  (Habeas Br. at 28–29).  The basis of Petitioner's motion for a mistrial was that the

trial court erred in its jury instruction on the State's burden of proof by referencing Petitioner's "guilt or innocence." (*Id.* at 28–29).[15]  The trial court charged the jury as follows:

> As is true with respect to every defendant in a criminal case under our system of constitutional liberty, [Petitioner] is presumed to be innocent unless he is proven guilty beyond a reasonable doubt.  This presumption of innocence continues throughout the whole trial of the case and even during your deliberations unless you have determined that the State has proven his guilt beyond a reasonable doubt.
>
> The burden of proof in this case is on the State and it never shifts.  The burden of proof remains on the State throughout the whole trial of this case.  No burden with respect of proof is imposed upon [Petitioner].  He is not obliged to prove his innocence.  With respect to each charge brought against [him], the fundamental rule is that unless the State has proved the crime charged and each of its essential elements beyond a reasonable doubt, [Petitioner] is entitled to a verdict of not guilty.
>
> You heard the opening statements.  (Defense counsel) in his opening statement said he would present proofs or present certain things that would lead to the conclusion that [Petitioner] was not guilty.  And the defense has introduced some evidence in that regard.  If you believe that the evidence does prove that [Petitioner] is innocent, you should, of course, bring in a verdict of not guilty.  However, the fact that [Petitioner] has attempted to prove his innocence does not shift the burden of proof.  The State always has the burden of proof.  It doesn't shift to him on any issue.  The State always has the burden of proof.  That burden never shifts no matter what proofs [Petitioner] offers.
>
> Thus, if [Petitioner] failed to prove his innocence in your view, and if your view also is that the State failed to prove his guilt beyond a reasonable doubt, you must bring in a verdict of not guilty.  You may bring in a verdict of guilty on a charge only if the State affirmatively proves the crime charged and each of its elements beyond a reasonable doubt.

(D.E. No. 6-65 at 12:11–13:23).

---

[15]     Petitioner also contends that the trial court erred in denying Petitioner's motion for a mistrial based on the alleged *Brady* violation discussed above.  *See* Section III.G, *supra*.  For the same reasons, Petitioner is not entitled to habeas relief.

The Appellate Division rejected Petitioner's argument on direct appeal.  *Thomas*, 2013 WL 1688374, at *30–32.  The Appellate Division acknowledged that the trial court's comments on innocence were troublesome, citing to *State v. White*, 360 N.J. Super. 406, 413 (App. Div. 2003), which instructs trial courts to avoid using terms "guilt and innocence" in jury charge.  *Id.* at *32. However, the Appellate Division found that, as a whole, "the balance of the charge and recharge clearly conveyed the State's burden of proof and did not suggest that [Petitioner] had to prove his innocence, or that the jury should return a guilty verdict if it found that [Petitioner] failed to prove his innocence."  *Id.*

The Appellate Division's ruling was not contrary to, or an unreasonable application of, federal law.  Petitioner fails to point to, and this Court is unaware of, any Supreme Court case holding that a court's references to a defendant's guilt or innocence while otherwise properly instructing the jury on the beyond-a-reasonable-doubt standard violates due process.  (*See* Habeas Br. at 28–29; Reply at 37).  Accordingly, Petitioner is not entitled to habeas relief on ground nine. *See Fitzgerald v. Warren*, No. 13-1163, 2016 WL 901079, at *6 (D.N.J. Mar. 9., 2016) (rejecting similar habeas claim where petitioner failed to identify any relevant clearly established federal law).

### J.    Ground Ten: Illegal Sentence

Next, Petitioner argues that his sentence of two consecutive life terms of imprisonment without parole was illegal.  (Habeas Br. at 31–32).  Petitioner asserts that, to sentence him to life without parole, there should have been a separate sentencing proceeding to consider aggravating and mitigating factors, and, absent such a proceeding, the imposition of the life without parole sentence violated the Ex Post Facto Clause of the United States Constitution.  (*Id.*).

The Ex Post Facto Clause of the United States Constitution forbids the enactment of any

criminal law that, among other things, imposes "a punishment for an act which was not punishable at the time it was committed[] or imposes additional punishment to that then prescribed." *See Weaver v. Graham*, 450 U.S. 24, 28 (1981). A law that is both retrospective and disadvantages the offender affected by it violates this rule. *Id.* at 29.

The basis for Petitioner's ex post facto argument stems from the law in effect at the time Petitioner murdered Eresman and Rewoldt on December 1, 2002, as well as an amendment to the law in 2007. (*See* Direct Appeal Br. at 120–22). At the time of the murders, the New Jersey homicide statute provided that a court "shall conduct a separate sentencing proceeding to determine whether" any person convicted of purposely or knowingly causing the death of another "should be sentenced to death or pursuant to the provisions of subsection b. of this section." N.J.S.A. § 2C:11-3(c)(1) (2000). Subsection b., in turn, provided for a maximum sentence of life imprisonment with parole eligibility after 30 years, except under certain circumstances warranting life without the possibility of parole, including where "the jury or court found the existence of one or more aggravating factors, but that such factors did not outweigh the mitigating factors found to exist by the jury or court . . . ." § 2C:11-3(b) (2000).

Before Petitioner's trial, however, the New Jersey Legislature amended the homicide statute in 2007 to abolish capital punishment. *See State v. Fortin*, 198 N.J. 619, 624 (2009). The amendment also eliminated reference to the "separate sentencing proceeding" and instead provides that a person convicted of purposely or knowingly causing the death of another "shall be sentenced by the court to life imprisonment without eligibility for parole . . . if a jury finds beyond a reasonable doubt that any . . . aggravating factors exist[.]" *See* N.J.S.A. § 2C:11-3(b)(4) (2007).

Petitioner argues, in essence, that the trial court failed to conduct the separate sentencing proceeding required under the prior homicide statute from the year 2000, and, instead, applied the

amended homicide statute to Petitioner, which did not require a separate sentencing proceeding. (*See* Habeas Br. at 31–32; Direct Appeal Br. at 119–22).  He contends that application of the 2007 amended homicide statute to him violated the Ex Post Facto Clause of the United States Constitution.  (*See* Direct Appeal Br. at 122).

The Appellate Division denied Petitioner's claim as follows:

> Here, the jury found [Petitioner] guilty of purposely and knowingly committing the murders of Eresman and Rewoldt by his own conduct and also found him guilty of armed robbery, contrary to N.J.S.A. [§] 2C:15-1(a)(1), which is a relevant aggravating factor. Because the criteria for the imposition of a life sentence without parole pursuant to the statute in effect at the time of the murders was satisfied, there was no ex post facto violation.
>
> [Petitioner] contends that a sentence of LWOP could only have been imposed after a separate penalty phase hearing in which the jury found an aggravating factor.  The United States Supreme Court supported the requirement for a jury determination under certain circumstances, holding:
>
>> Any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt . . . It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt.
>>
>> [*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).]
>
> [Petitioner] asserts that the failure of the court to conduct a separate penalty phase proceeding and the jury to find in a separate proceeding an aggravating factor beyond a reasonable doubt during that proceeding precludes the imposition of a LWOP sentence.  We disagree.
>
> [Petitioner] was found guilty of armed robbery which is an aggravating factor for purposes of the imposition of the LWOP sentence.  Since the offense was submitted to a jury and proven beyond a reasonable doubt, the State is not obligated to prove the

> offense a second time in a separate penalty proceeding.  *See State v. Johnson*, 376 N.J. Super. 163 (App. Div.), *certif. denied*, 183 N.J. 592 (2005); *see also* R. 3:19–1.

*Thomas*, 2013 WL 1688374, at *34–36.

Here, Petitioner fails to show how the Appellate Division's determination was contrary to, or an unreasonable application of, the Ex Post Facto Clause or any other federal law.  (*See* Habeas Br. at 31–32; Direct Appeal Br. at 119–22).  Petitioner's argument that the imposition of a sentence of life without parole and without a separate sentencing proceeding violated the Ex Post Facto Clause is meritless.  The parties agreed that the prior statute from the year 2000—*i.e.*, not the 2007 statute—was applicable.  (*See* D.E. No. 6-51 at 64:8–13).  Applying the 2000 statute, the trial court reasoned that, because the State was not seeking the death penalty and the trial jury had found the existence of an aggravating factor, Petitioner was not entitled to a separate sentencing proceeding under the 2000 statute.  (*See id.* at 64:12–80:23).  According to the trial court, regardless of whether mitigating factors were found to exist by a separate sentencing jury and regardless of whether that jury determined unanimously that the mitigating factors outweighed the aggravating factor, the 2000 statute mandated a sentence of life without parole.  Because the trial court did not apply the 2007 statute to Petitioner, no Ex Post Facto Clause violation occurred.  Thus, the Appellate Division's determination to affirm the trial court's ruling was not contrary to nor an unreasonable application of clearly established federal law, and Petitioner is not entitled to habeas relief on this ground.

### K.    Grounds Eleven and Twelve: Ineffective Assistance of Trial Counsel

In grounds eleven and twelve, Petitioner asserts two arguments that his trial counsel provided ineffective assistance in handling Petitioner's defense.  The Court considers these arguments together.

46

In ground eleven, Petitioner maintains that trial counsel was ineffective for failing to thoroughly discuss the relevant ramifications associated with Petitioner's decision not to testify at his trial.  (Habeas Br. at 33–40).  According to Petitioner, had trial counsel fully explained the impact of him not testifying at trial, Petitioner would have testified that he was not inside FuncoLand on the morning in question, that co-defendants Rock and Joey committed the murders, and that the circumstances of his confession were coercive.  (*See id.*).

In ground twelve, Petitioner maintains that trial counsel was ineffective by coercing him to waive his right to testify at the *Miranda* hearing.  (Habeas Br. at 42–47).  Petitioner argues that, had he testified at the hearing, the trial court would have found that he requested an attorney and suppressed his statements to the police.  (*See id.*).

The two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington* governs Petitioner's claims of ineffective assistance of counsel.  466 U.S. 668, 687 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  *Id.*  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  A petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable."  *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.  To establish prejudice, a petitioner "need not establish that the attorney's deficient performance more likely than not altered the outcome" of the petitioner's case, but only that there is a reasonable probability of such an effect upon the outcome of the case.  *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).

In rejecting Petitioner's claims on PCR appeal,[16] the Appellate Division found that Petitioner failed to present "any competent evidence in the form of a certification as to the substance of his potential testimony render[ing] his PCR allegations nothing more than 'bald assertions.'" *Thomas*, 2017 WL 2978380 at *2.  As a result, the Appellate Division determined that the allegations "fall short of establishing a prima facie claim of ineffective assistance." *Id.*

The Appellate Division's determination was not contrary to, or an unreasonable application of, clearly established federal law.  Where a "petition contains no factual matter regarding Strickland's prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief.  *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010).  Thus, the Appellate Division's determination that Petitioner failed to allege a prima facie ineffective assistance of counsel claim because he did not offer competent evidence of prejudice is consistent with federal law.  Accordingly, Petitioner is not entitled to relief on grounds eleven and twelve.

## L.    Ground Thirteen: Cumulative Errors

In Petitioner's final ground, he argues that the cumulative errors, as argued in all prior grounds for relief, constituted a denial of due process.  (Habeas Br. at 48).  In order to constitute redressable "cumulative error," the deficiencies in a case must overall have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in

---

[16]    As the New Jersey Supreme Court summarily denied Petitioner's petition for certification on PCR appeal, *see Thomas*, 177 A.3d at 106, this Court "looks through" the summary denial and applies Section 2254(d)'s standards to the Appellate Division's determination on PCR appeal for Grounds Eleven and Twelve. *See Bond*, 539 F.3d at 289–90.

determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation and citation marks omitted).

As previously discussed, Petitioner's claims were extensively reviewed and rejected on the merits by the state courts, both on direct and collateral review, and those decisions easily withstand review under the AEDPA. In addition, this Court conducted a de novo review of Petitioner's unexhausted arguments and found them meritless. Moreover, Petitioner has (i) failed to cast doubt over the proofs of his guilt, and (ii) failed to establish that he has suffered any prejudice from the purported errors. Thus, Petitioner has not proven that the alleged cumulative errors had "a substantial and injurious effect or influence in determining the jury's verdict." *See Fahy*, 516 F.3d at 205. Based on all the foregoing, Petitioner's final ground is denied.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner's claims are all without merit and jurists of reason would not disagree with this Court's denial of Petitioner's habeas petition. Accordingly, Petitioner is denied a certificate of appealability.

## V.   CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED,

and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.


Dated: March 1, 2022                                    s/ *Esther Salas*_____
                                                        **Esther Salas, U.S.D.J.**